# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE

## STATE OF TENNESSEE v. SERIA D. WARD

**Direct Appeal from the Criminal Court for Davidson County**
**No. 95-D-2710B     Thomas H. Shriver, Trial Judge**

---

### No. M1998-00128-CCA-R3-CD - Decided July 12, 2000

---

The defendant was convicted in Davidson County of especially aggravated robbery and sentenced to confinement for seventeen years. He appealed the conviction, alleging that the evidence was insufficient to convict him of the offense, that his videotaped confession should have been excluded, and that his trial counsel was ineffective. Based upon our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

GLENN, J., delivered the opinion of the court, in which RILEY and WITT, JJ., joined.

Timothy V. Potter, Dickson, Tennessee, (on appeal), and William C. Roberts, Jr., Nashville, Tennessee (at trial), for the appellant, Seria D. Ward.

Paul G. Summers, Attorney General and Reporter, Michael E. Moore, Solicitor General, Kim R. Helper, Assistant Attorney General, Victor S. Johnson, III, District Attorney General, and Nicholas A. Bailey, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

The defendant, Seria D. Ward, appeals as of right from the judgment of the Davidson County Criminal Court in which he was convicted of especially aggravated robbery of the victim, Donald Bonds, Jr. The defendant was sentenced to seventeen years in the Tennessee Department of Correction. The trial court denied the defendant's motion for a new trial a few weeks after his attorney failed to file a brief regarding the defendant's statement to police as requested by the court. The defendant appealed his conviction and raises three issues for our consideration:

    1.   Whether there was sufficient evidence to convict the defendant of especially aggravated robbery.

    2.   Whether the trial court erred by not excluding the defendant's videotaped confession.

3. Whether the defendant received ineffective assistance of trial counsel.

## PROCEDURAL BACKGROUND

On November 27, 1995, the defendant was indicted by a Davidson County Grand Jury for the especially aggravated robbery of Donald Bonds, Jr., in violation of Tennessee Code Annotated § 39-13-403. He pled not guilty at the arraignment. Following a three-day trial on February 3-5, 1997, the jury found the defendant guilty as charged. The defendant filed a motion for a new trial, which was denied by the trial court on September 8, 1997. The defendant filed a notice of appeal on March 6, 1998.[1]

## FACTS

This case resulted from the robbery and shooting of an ATM patron on August 25, 1995. The victim, twenty-eight-year-old Donald McKinley Bonds, Jr., was the State's first witness to testify at trial. On the evening of the robbery, the victim borrowed his stepmother's white 1995 Mercedes Benz and planned to meet some friends at Rodeo's on Murfreesboro Road near Thompson Lane in Nashville. He testified that he stopped at the First Union Bank automated teller machine about a block from Rodeo's between 9:00 and 9:30 p.m. to get some cash. As the victim pulled into the parking lot where the ATM machine was located, he noticed a royal blue Geo Tracker[2] that appeared to be following a man who had just finished making a transaction. At trial, the victim identified a photograph of what appeared to be the blue Tracker. The victim testified that the Jeep went around to the back of the bank. He left the Mercedes running with the lights on while he went to the ATM machine. After receiving forty dollars from the machine and placing the bills in his wallet, he proceeded back to the car. As he opened the car door, the victim heard someone behind him and turned to look. He described the person he saw as a black man, approximately twenty years old, five feet eleven inches tall, and weighing one hundred and sixty-five pounds, who was wearing a blue windbreaker jacket with the hood pulled up over his head. His hand was in his pocket, and the victim stated that he could also see the back of an assault-type pistol protruding from the assailant's pocket. The victim identified a photograph of a blue jumpsuit like the one the assailant was wearing during the robbery. The assailant demanded the victim's money. As the victim attempted to get his money out of the wallet, the assailant grabbed the wallet and shot the victim in the chest. The victim had credit cards, his driver's license, and money in his wallet.

---

[1]The defendant's trial counsel filed the first notice of appeal on January 21, 1998, which was outside of the thirty days allowed under Tenn. R. App. P. 4(a). This court subsequently entered an order waiving the thirty-day requirement in the interest of justice and making the date of filing the appeal the same as the date of the order, March 6, 1998.

[2]Throughout the trial testimony of witnesses, some referred to this vehicle as a blue Jeep Tracker or blue Jeep.

After the victim was shot, the assailant jumped into the blue Tracker, which was located approximately twenty to twenty-five feet behind the assailant, and the Tracker drove away quickly without its lights on. The victim described the sensation of the bullet going into his chest and exiting out of his back and stated he felt blood pumping down his back and out of his chest. He was able to use his stepmother's car phone to call 911. While he waited for help, the victim tried to stem the flow of blood by putting his finger into the hole in his chest and pressing the wound in his back against the car window. He also had difficulty breathing, due to a collapsed lung.

The victim initially remained conscious and was able to give a statement to the police at the scene in which he described the assailant's vehicle, but he never saw the driver. He stated that he may have lost consciousness on the way to the emergency room but remembered being in the hospital. Surgery was performed after the victim was admitted, and he awoke the next day with an open incision in his stomach that was packed full of cotton. A chest tube that was inserted during surgery became infected and had to be replaced. The victim remained in the hospital for fourteen days with injuries to his spleen, pancreas, and lung. The chest tube was still in place when the victim went home, and a bag that collected lung fluid had to be changed every four to five hours. The victim was subsequently readmitted to the hospital for a lung infection.

The victim described the swelling, nausea, and intense cramps he experienced with his stomach. After the chest tube was finally removed, X-rays revealed that scar tissue from the incision had blocked his intestines and had to be surgically corrected. According to the victim, he missed a total of about three months of work. The victim testified that he still has trouble with shortness of breath from the injury to his left lung.

On cross-examination, the victim admitted that his description of the assailant given to the police while he was hospitalized was probably vague. He stated that his description of the assailant's vehicle was probably most helpful help to them in making an arrest.

The State's next witness was Steve Hopkins, an employee of the Waffle House located across the street from the bank involved in this case. On the evening of August 25, 1995, Hopkins and his wife were leaving the Waffle House when he heard a popping sound coming from the bank. Hopkins then saw a blue Jeep-like vehicle pull up and someone get in on the passenger's side. The Jeep left at a high rate of speed and turned left up a road near the bank. Hopkins also saw a white Mercedes with its hazard lights blinking parked near the ATM. When he crossed the street toward the scene, Hopkins could see a man leaning up against the door of the Mercedes and bleeding from a gunshot wound right below his heart. The man, whom Hopkins described as having difficulty talking, was already on the phone with the police when Hopkins approached him. Hopkins stayed until the paramedics arrived and gave a description of the vehicle as a blue Jeep or Geo Tracker with a white or beige vinyl top. He did not see any faces or remember if the headlights were on as the Jeep left the scene.

On cross-examination, Hopkins agreed that the Waffle House could be as much as two hundred and fifty feet away from the bank and that he did not see what actually happened before the person jumped into the Jeep and pulled away. He admitted that he could not see any faces or what

the person who jumped into the Jeep was wearing.

Sharon Windsor testified next for the State. On the evening of August 25, she was leaving the Waffle House around 9:30 p.m. when she heard what she thought was a gunshot coming from across the street. As she looked in that direction, she saw a man standing over another man and a white car parked close to the ATM machine. She also saw a black Jeep close to the white car and a black man jump into the Jeep. The witness stated that she did not see any lights on the Jeep. After the man jumped into the Jeep, Ms. Windsor saw the vehicle go into reverse, heard the motor being gunned, and saw the vehicle speed away down a back street. When she noticed the emergency lights begin to flash on the white car, she went back into the Waffle House and called 911.

Ms. Windsor then crossed the street to the scene, where she saw the white car's window shattered with blood on it and the victim slumped down in the corner of the car door and bleeding profusely. She stayed on the scene until the paramedics and the police arrived.

The witness admitted that she is blind in her right eye but has twenty-twenty vision out of her left eye. She also admitted that she could not identify the assailant or the driver of the Jeep. Ms. Windsor did not remember telling Detective Nidiffer shortly after the incident that she could not tell the race of the assailant because of her blind eye. She was certain that she could see that the assailant was black.

On cross-examination, Ms. Windsor agreed that she had given the police a description of the assailant as a young black man with short hair and a light shirt on. She was certain that she could tell distinctly with her good eye from the Waffle House, two hundred and seventy feet away, that the assailant was a black man.

The next witness for the State was Officer Bryan Johnson with the Metro Nashville Police Department. On August 25, 1995, Officer Johnson received a dispatch to 1110 Murfreesboro Road regarding a shooting. When he arrived at the scene, he saw a vehicle in front of the bank with the driver's side door open. The victim was on his knees and leaning up against the inside of the car door while talking on the phone. Two female witnesses were also present. Officer Johnson could see blood on the victim's shirt coming from what appeared to be a single gunshot wound just below the nipple on the left side of the victim's chest. The victim was having difficulty speaking but was able to tell Officer Johnson that his name was Don Bonds and that he had been robbed of his wallet. The witnesses were asked to remain until a detective from the armed robbery division arrived, and the scene was sequestered using crime scene tape.

On cross-examination, Officer Johnson stated that he did not take the witnesses' names or interview them. His report stated that the officer had observed a male witness on the scene talking on the victim's car phone when he arrived. All witnesses were interviewed by the Armed Robbery detectives.

Officer Charles Ray Blackwood, Jr., an eighteen-year veteran of the Metro Police Department, testified that he responded to a crime scene at 1110 Murfreesboro Road on August 25,

1995, at 9:45 p.m. The victim had already been transported to the hospital, and other officers were on the scene by the time Officer Blackwood arrived. He prepared a diagram of the scene and a report of measurements, which he used at trial to describe the placement of the car and the Waffle House. A nine-millimeter shell casing and the bullet or projectile portion were found in the center area of the parking space directly in front of the bank. Officer Blackwood estimated that these items were found eleven or twelve feet from the Mercedes. In his testimony, he used the diagram and his measurements to pinpoint distances, including the distance from the Waffle House to the ATM, which was two hundred and sixty-seven feet. The officer then identified seventeen photographs that he had taken at the scene, which were shown to the jury as he explained each one. He also identified the spent Winchester nine-millimeter Luger shell casing and the projectile collected at the scene. The projectile was deformed and flattened out, probably caused when the bullet hit the victim's car door. Officer Blackwood testified that it was presumably the same bullet that passed through the victim before it struck the car.

Four days after the crime, Officer Blackwood was called to process a Geo Tracker at the police department. He identified photographs taken of the vehicle and live rounds of ammunition, the same type as found at the crime scene, that were discovered on the floorboard of the Tracker. The officer explained that the bullets in the Tracker and the one at the crime scene were full metal jackets, which are made out of lead and do not have a hollow point. The brand marking on the shell casings of the Tracker bullets matched the one found at the crime scene. The witness identified a photograph of a navy jacket and the jacket itself, that was also found in the vehicle, with a one and one-half inch hole in it that appeared to have been made by a weapon. In addition, he identified two of the six live rounds collected from the Tracker, which were also admitted into evidence.

On cross-examination, Officer Blackwood admitted that he has had no formal training in metallurgy or how bullets travel through bodies, other than his years of experience in dealing with several hundred crime scenes. He also explained some of the measurements on his diagram and the drawing in his report, as well as the location of the blood on the pavement and car. He recalled witnessing a check for latent fingerprints done by other officers at the scene. It was Officer Blackwood's opinion that a dent found in the passenger's left rear door was where the projectile struck between the vent window and the opera window of the Mercedes. He displayed the navy jacket again for defense counsel and explained the hole in the left pocket as consisting of a smaller entry hole inside the pocket, where something tore through at a high velocity, and a bigger exit hole on the outside. This was consistent with the firing of a weapon from inside the jacket and with what Officer Blackwood has seen many times before in other cases.

Dr. Anthony Dake, chief resident and emergency room physician at Vanderbilt University Medical Center, testified about the victim's injuries. On August 25, 1995, Dr. Dake was on duty at the Vanderbilt emergency room when the victim was brought in with a gunshot wound just below his left nipple that had exited below his shoulder blade in back. As a result, the victim sustained injuries to his lung, his stomach in two places, and his spleen. Dr. Dake explained that the holes in the victim's stomach were very dangerous, due to the fact that the contents can spill into the abdominal cavity and cause infections. The victim had to be stabilized, and Dr. Dake estimated that he had lost about five units of blood. The loss of blood and the wound were life-threatening and

produced extreme pain. The victim's lung had also collapsed. Dr. Dake stated that the victim would have died if the paramedics had not responded and he had not been treated quickly in the emergency room. Surgery was performed to insert a chest tube to drain the blood and air from the chest cavity, and a laparotomy was done to ascertain the damage to his stomach and spleen. The victim remained in the hospital for two weeks and had to have additional treatments for infection.

Anna Carole Curtis, a security specialist for First Union National Bank, testified next. She stated that the bank provides lighting and surveillance cameras inside their ATMs. The tapes from the cameras are recorded over every ninety days. Ms. Curtis testified that, at the request of police, she turned over the surveillance tape from August 25, 1995, covering 1110 Murfreesboro Road. Since this incident, the bank has installed a panic button for ATM patrons to use if they need help.

Sergeant Anita Flagg from the Murfreesboro Police Department was the State's next witness. On August 29, 1995, she spoke with the defendant about the ATM shooting. The defendant told Sergeant Flagg that he was present during the incident, so she called the Nashville detectives who had been working on the case. During the phone call, the defendant told the detectives that he had been in the car with "Robert" and had been dropped off at the H. G. Hill store. The defendant told them he heard shots as he came out of the store and saw Robert getting into his car to come pick him up. The defendant voluntarily waited at the station for the detectives to arrive to speak with him.

During questioning by the Nashville detectives, the defendant claimed that he did not know Robert's last name, but he called Robert's telephone number and then participated in a taped conversation during which Robert Merritt's location was determined. When Sergeant Flagg and another officer proceeded to the location to find Merritt, they saw the blue Tracker that had been described to them leaving the area and stopped it. Robert Merritt was driving the vehicle. After Merritt was arrested, he was taken to the Murfreesboro Police Department, where he gave a statement. The defendant was also questioned again.

On cross-examination, Sergeant Flagg stated that the defendant came into the police station with several people on the day she first spoke with him about the robbery. One woman with him stated that the defendant had something to tell the sergeant. The defendant never admitted that he was involved in the robbery, only that he was present. Flagg testified that she felt the defendant gave the information voluntarily.

Detective Dean Haney of the Metropolitan Police Department was the next witness for the State. Haney assisted the lead detective in the investigation of this case. On August 28, 1995, Haney took possession of the security tape of First Union's ATM covering the night of the robbery. He played the tape frame by frame and saw a bright burst of gunfire but was unable to see who the perpetrators were. Haney gave the tape to the media in hopes that someone in the community had information on the crime. The person who had used the ATM just before the victim was located from the film and gave a description of the vehicle involved in the crime. A slowed-down version of the security tape was shown to the jury. On the video, the victim could be seen making his transaction at the ATM at 9:29 p.m. and walking back toward his car. Someone passed in front of the victim's car headlights and a bright flash was seen. At 9:32 p.m., headlights of another car could

be seen. This tape was released to the media on August 28.

The next day, Haney received information regarding a potential witness in Murfreesboro. Detective Jeff Nidiffer[3], the lead detective, and Haney went to Murfreesboro, where Nidiffer briefly spoke with this witness, the defendant. The defendant was advised of his rights and gave a statement to the detectives. He did not implicate himself in the robbery at that point or admit any prior knowledge of the crime. However, he agreed to call Robert about the robbery and have the conversation recorded.[4] The detectives stated that they were able to ascertain Robert's last name from the conversation.

The taped conversation between Robert Merritt and the defendant was then played for the jury. The defendant also told the detectives that Merritt had put a blue jacket over a Mac 11 handgun and had blown a hole in the jacket when he shot the victim. He told them that the jacket should still be in the Tracker.

When the detectives arrested Merritt, he was driving the blue Geo Tracker. A search of the vehicle produced the jacket and live nine-millimeter rounds of ammunition that were consistent with what was used in the robbery. Merritt's statement to the police alleged that defendant had pulled a gun on him and demanded that he rob the victim. At this point, the police began to focus on the defendant as a suspect and questioned him again. When he was presented with Merritt's statement, the defendant became upset and admitted that he and Merritt had talked about robbing someone after he bought a drink and cigarettes. The defendant said that, at the scene of the crime, he saw the victim hand his wallet to Merritt after being confronted by him and then heard a shot. The defendant stated that Merritt jumped back into the Tracker and stated that he had shot out the victim's window. Merritt pitched the victim's wallet out of the car somewhere during the drive back to Murfreesboro. During the questioning, the defendant admitted that he knew the robbery was going to take place, that Merritt had a loaded assault-type weapon in his car for the purpose of committing a robbery, and that he (Ward) was the driver of the car that left the scene. The defendant was then taken into

---

[3]Detective Nidiffer's name is spelled in the trial transcript as "Nidifer" and "Nidiffer". We will use the spelling the detective gave in his testimony, "Nidiffer".

[4]The tape recording of the phone conversation reveals a friendly and cordial conversation between the defendant and Merritt. The defendant talked to Merritt about the news reports of the ATM robbery. At one point, the defendant said to Merritt, "I thought you told me that gunshot was because you shot out his window," to which Merritt seemed surprised and answered, "Nah . . . the window? Did they say the window was blown out?" This does not support the defendant's version that Merritt was angry at him and did not want to have anything to do with him after he refused to participate in the robbery. It also undermines the defendant's claim that he did not know the victim was shot, and Merritt told him that he had blown out the victim's car window.

custody and brought back to Nashville, where he gave a videotaped statement.[5]

On cross-examination, Haney stated that the defendant had been interviewed twice in Murfreesboro and once in Nashville on August 28, 1997. During his first interview, the defendant appeared to be anxious to get something off his chest, and Haney found the information he gave to be very helpful in leading to Robert Merritt. Haney recalled with certainty that the defendant stated in the second interview that he and Merritt had been talking about robbing someone, but it was not in Haney's notes that the pair ever discussed shooting anyone or that the defendant directed or solicited Merritt to shoot anyone. It was not in Haney's notes that the defendant intended to share in the profits, but each of the assailants gave statements that the other assailant got the money. Haney agreed that the defendant and Merritt may have only spent two hours together the evening of the robbery.

The next witness in the State's case was Steve Scott, a forensic scientist for the Tennessee Bureau of Investigation Crime Lab, whose specialty is firearms identification. Scott received the navy jacket that was retrieved from Robert Merritt's car and was requested to determine the distance at which the victim was shot. Scott described the three tests that were performed on clothing in making such a determination. After performing the tests, it was Scott's expert opinion that the gun was in contact or near contact with the inside of the garment when the shot was fired and went through the garment.

The final witness for the State was Detective Jeff Nidiffer, with the Metropolitan Police Department, who was the lead investigator and was present during the defendant's statements to police. When Nidiffer arrived at the crime scene on August 25, 1995, the victim was already en route to the hospital. The detective was able to speak to the victim's father and received information and reports from other police officers pointing to two black males in a blue Geo Tracker. He also had oversight duties for gathering evidence at the scene. David Thom of the bank's security department obtained the security tape of the ATM, and copies were distributed to the media on Monday, August 28. He testified that on Tuesday, August 29, Sergeant Flagg called to inform him that there was a potential witness at the station named Seria Dwayne Ward. Nidiffer had a brief phone conversation with the defendant, wherein the defendant told him enough facts for Nidiffer to know he needed to speak with him. Haney and Nidiffer went to see the defendant, and Haney read the defendant his Miranda rights at 1:03 p.m.

In his first oral statement, the defendant told detectives that he and Merritt had gone to Big Daddy's nightclub off Murfreesboro Road in Nashville. Merritt dropped him off at the H. G. Hill store to get cigarettes and a Coke. When the defendant came out of the store, Merritt was standing next to a white man by a white Mercedes that had the window shot out. Merritt got into his Geo Tracker and drove over to pick up the defendant, and the pair returned to Murfreesboro.

---

[5]Detective Nidiffer subsequently identified the videotaped statement that he took from the defendant.

The defendant agreed to call Merritt and allow the detectives to record the conversation. During the call, the detectives ascertained Merritt's location to be 2822 Black Stallion Court in Murfreesboro. Nidiffer went to the address where Merritt was contacted. The defendant, who was still considered a witness at that point, stayed behind at the station. Merritt was stopped leaving his neighborhood in the blue Geo Tracker, and a navy jacket was recovered from the vehicle, along with nine-millimeter bullets. These live rounds were consistent with the projectile and casing found at the crime scene. Merritt was taken back to the police station where he gave a statement, implicating the defendant as a participant.

Nidiffer testified that, when the defendant was confronted with Merritt's statement, the defendant changed his original version of the story. The defendant said in his second oral statement that the pair discussed robbing someone at the ATM with Merritt's semi-automatic handgun, a Mac 11. He stated that he told Merritt not to rob anyone at the ATM, because there were cameras in the machine. With the defendant at the wheel, Merritt exited the Geo Tracker that was parked to the side of the bank and remained there until the victim finished his banking transaction. Merritt covered his gun with the jacket as he approached the victim. The defendant stated that he drove the Tracker toward the victim's car while the robbery was taking place and pulled up within twelve feet of the robbery. He saw Merritt take a wallet from the victim, and the gun was fired. Merritt jumped back into the Tracker, and the pair drove up the hill on Bowwood Drive. Merritt threw the victim's wallet out of the window on the way back to Murfreesboro. Merritt was upset that he had gone to all that trouble and had shot a hole in his jacket for thirty dollars. Detective Haney and Sergeant Flagg were present with Nidiffer during this second statement. According to Nidiffer, neither the defendant nor Merritt would admit getting any proceeds from the robbery during questioning.

Nidiffer transported the defendant and Merritt back to Nashville to face charges of especially aggravated robbery. The Tracker was processed, and the jacket was sent to the TBI Crime Lab. Statements of the pair were videotaped in Nashville.[6] The gun was never recovered. Nidiffer stated that the defendant said that he had prior knowledge of the robbery and planned and participated in the crime.

---

[6]The defendant's videotaped statement was played for the jury. In his videotaped statement, the defendant told basically the same story he told the detectives in his second Murfreesboro statement, except he admitted to detectives on videotape that he was "high" the night of the robbery. He admitted that he knew Merritt was going to rob somebody after they left Big Daddy's nightclub in Nashville and that he knew Merritt was hiding a Mac 11 in his jacket when he left the Tracker and approached the victim. The defendant could see the victim put his arms out, as if to push Merritt away from him, and grab his side after the gun was fired. The defendant claimed that he thought the victim was just looking at his car window and was not shot. He admitted driving Merritt away from the scene but said he stopped on a side street and told Merritt that he was going to have to drive. Merritt tossed the wallet out of the window on the way back to Murfreesboro. The defendant denied getting any of the proceeds from the robbery but admitted borrowing five dollars from Merritt for food when he was dropped off at his aunt's house.

On cross-examination, Nidiffer stated that there was nothing in his notes or report to indicate that the defendant ever ordered, condoned, or approved of the shooting of the victim. The detective agreed that the defendant was not the owner of the weapon and that his investigation led him to believe that Robert Merritt was the owner of the Geo Tracker, the gun, and the jacket with the bullet hole in it. Nidiffer did not recover any money from the defendant after the robbery. According to Nidiffer, the defendant was trying to convince them during his first interview that he was a witness to the incident and wanted to help them catch the perpetrator but remained cooperative, even when he began to face some of his own culpability.

The State then rested its case, and the defense's subsequent motion for judgment of acquittal was denied by the trial court.

The defendant testified on his own behalf. The defendant said that he met Robert Merritt around 7:30 p.m. on August 25, 1995, and the pair drove in Merritt's car to Nashville for a party at Big Daddy's nightclub. They left the club when no party materialized and went to the store, where the defendant bought cigarettes and a Coke. On the way back to Murfreesboro, Merritt pulled into a bank parking lot, where the victim's car was parked in front of the ATM machine. Merritt stated that the victim had money, because he was driving a Mercedes, and asked the defendant to get out and rob the victim. The defendant testified that when he refused Merritt began calling him names and got out of the car with the jacket on. The defendant stated that he did not know Merritt very well and was angry and afraid. According to the defendant, he had known Merritt from school for about three or four years, but Merritt was not in his usual circle of friends. Although the defendant did not see the gun, he knew it was under Merritt's jacket.

The defendant, who was still in the passenger seat, could see Merritt with the victim. The victim had his arms extended from the shoulders as if to push Merritt off. The defendant stated that he put the car in reverse, told Merritt to "come on," and asked what he was doing. Merritt got in the car, and the defendant drove up the hill on the side of the bank. According to the defendant, Merritt told him to "shut up" when the defendant asked what that noise was and told him that he had shot out the victim's car window. The defendant stated that he refused to let Merritt drive back the way Merritt wanted to go. Merritt told the defendant he did not want to have anything to do with him and was complaining about the little amount of money in the victim's wallet, which he threw out of the car window on the way back to Murfreesboro. Merritt then dropped the defendant off at his aunt's house. As he was getting out of the car, the defendant asked Merritt to give him some money for food. Merritt gave him five dollars.

The defendant was handed the case supplements prepared by Haney and Nidiffer, and the defendant testified that he did not create or sign these documents. He testified that he did not drive away when Merritt was robbing the victim, because he was afraid of what Merritt might be capable of doing to him. Contrary to his previous statements, the defendant testified at trial that he did not know for a fact that Merritt had a gun when he exited the vehicle. He also stated that he had never seen Merritt display anger before in the way that he did on the night of the robbery.

On cross-examination, the defendant stated that he had never given all of the details of his

courtroom version of the events in any of his other statements, because no one had asked him. He did not give a reason why he did not tell the police or anyone else for over eighteen months that he had been forced by Merritt to do something he did not want to do. He stated that he had only been involved with Merritt for three days before the robbery and could not say how long he and Merritt were at Big Daddy's club or how long they were together before the robbery. He denied having anything to drink at the club. He also denied telling Merritt not to rob the victim in front of the ATM camera. He stated that the pair never talked about robbing anyone, and he first realized that a robbery was going to take place when Merritt pulled up in the bank parking lot. He denied already being in the parking lot when the victim pulled up, as had been stated by the victim. According to the defendant, the Jeep did not pull in back of the bank when the victim pulled up, and he did not have the headlights off when he picked up Merritt and fled the scene. The defendant admitted that on the Saturday after the robbery, Merritt gave the defendant's girlfriend a live nine-millimeter round of ammunition to see if the defendant had any that matched. Apparently, Merritt's gun had been stolen from his car, and he thought the defendant had taken it.

The defendant testified that he saw the victim on television and called the police. His friend's mother drove him to the police department. He spoke with Sergeant Flagg, who took his name and address and called the Metro police. The defendant relayed his version of the events to a Metro detective over the phone, and Metro officers drove to Murfreesboro to interview him. He said that he had lied when he did not tell Sergeant Flagg or the Metro detectives of his level of involvement in the crime but did so because he was scared. After the police talked to Robert Merritt, the defendant told them the truth of his involvement, because Merritt's version of the event was not true. He admitted that he knew Merritt had a loaded gun when he got in the car with him that night and that Merritt had it in his lap as they drove out of Murfreesboro. The defendant also admitted that he knew Merritt was going to rob the victim when he exited the car at the bank. However, later in cross-examination, the defendant said he did not know if the gun was loaded, but he was afraid of getting shot if he did not get in the driver's seat and pick up Merritt after the robbery. The defendant did not explain why he did not just run or drive away when he realized that Merritt was going to rob the victim. When asked why he went on his own to pick Merritt up after the shooting and sped away, he stated he was afraid of what Merritt might be capable of doing to him. When the prosecutor took the defendant through many of his statements on the videotape that were also shown to the jury, he stated either that he did not remember making many of the statements or that he disagreed with them.

The defendant admitted that Merritt was willing to talk with him on the phone from the Murfreesboro police station and had given him money for food on the night of the robbery, although the defendant was then claiming that Merritt was angry with him after the robbery and did not want anything to do with him after that time. According to the defendant, Merritt got all of the money from the robbery in spite of Merritt's statement to police that the defendant got all of the money. The defendant said that he made untrue statements to police on the videotape, but he could not specify what was untrue.

**ANALYSIS**

-11-

## Standard of Review

Questions involving the trial court's application of law to the facts of a case are reviewed *de novo* by this court, as are mixed questions of law and fact. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998); Harries v. State, 958 S.W.2d 799, 802 (Tenn. Crim. App.), perm. app. denied (Tenn. 1997). After a careful review of the record, we AFFIRM the judgment of the trial court on all three issues.

## I. Suppression of Videotaped Statement

Because this statement is potentially part of the evidence considered in the defendant's sufficiency of the evidence argument, we will consider this issue first in our analysis. On October 18, 1996, a hearing was held on the defendant's motion to suppress his videotaped statement to police, at which Detective Nidiffer testified. He stated that the defendant was given his rights orally in Murfreesboro before he was questioned. The defendant was Mirandized again when the detectives took him back to Nashville to face charges of especially aggravated robbery and before any written statements were taken from him. The detective was present when a written Miranda waiver form was executed by the defendant. A copy of this waiver was made an exhibit to the hearing. A videotaped statement was then taken from the defendant.

The trial court reviewed the videotape several times before ruling that the waiver of rights was voluntarily executed by the defendant and denying the motion to suppress. After our own review of the record and the portion of the videotape in which the defendant was advised of his rights, we conclude that the trial court was correct in denying the defendant's motion to suppress the statement and affirm the ruling of the trial court.

In State v. Odom, 928 S.W.2d 18 (Tenn. 1996), our supreme court set forth the standard that appellate courts must use in reviewing a motion to suppress. Questions of credibility of witnesses, as well as the weight and value given to evidence, are the province of the trial court and will not be disturbed on appeal unless the evidence preponderates against those findings. Id. at 22-23; see also State v. Crutcher, 989 S.W.2d 295, 299 (Tenn. 1999). In determining where the preponderance lies, we must give the prevailing party in the trial court the strongest legitimate view of the evidence and all reasonable inferences drawn therefrom. Crutcher, 989 S.W.2d at 299; Odom, 928 S.W.2d at 23.

Whether a waiver of Miranda rights is knowing, intelligent, and voluntary depends on the totality of the circumstances under which the rights are waived. State v. Callahan, 979 S.W.2d 577, 581 (Tenn. 1998). This is true, even when a juvenile suspect is involved. Id. at 583. When a suspect invokes the right to counsel, any questioning by the police without an attorney present is constitutionally impermissible. State v. Stephenson, 878 S.W.2d 530, 547-48 (Tenn. 1994). In Stephenson, our supreme court stated that even when a suspect makes an ambiguous or equivocal request for counsel, most courts have concluded that questioning by officers must cease, and all further questions must be limited to ascertaining whether the suspect wishes to consult with an attorney before answering any more questions. Id. at 548 (citations omitted). That court held that a suspect's question to a police officer asking whether he needs an attorney can be sufficient to limit

-12-

further interrogation to clarification of the suspect's desire for counsel.  Id.

However, in State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), our supreme court applied the standard in Davis v. United States, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994), which gave the minimum requirement for a suspect to invoke his Miranda right to counsel.  The Davis court stated that the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."  Davis, 512 U.S. at 459, 114 S. Ct. at 2355.  Using the Davis standard, our supreme court stated that "[i]f the suspect fails to make such an **unambiguous** statement, police need **not** cease questioning."  Huddleston, 924 S.W.2d at 670 (emphasis added).  With these principles in mind, we turn to the facts of this case.

Before the videotaped statement was made, Detective Haney read the defendant his rights for the second time that day, including his right to counsel before answering questions.  At the end of the reading, Haney asked the defendant if he understood his rights, and the defendant responded, "How I [sic] get a lawyer?"

> Detective Haney:  If you can't afford one, they'll appoint you one. Okay.  Usually they'll do that if your parents cannot afford one or you cannot afford one, they'll appoint you one over in court.  That's what they'll do.
>
> Defendant:  How I [sic] get one?
>
> Detective Haney:  Well, once you go to court and you go over there or you can contact one and you can talk to one. . . .  Now if you want to talk about this without an attorney here, well, we need to know better right now.
>
> Defendant:  Just tell me what ya'll think, do I need one?
>
> Detective Haney:  Well, hang on here . . . No, I can't tell you that.  If you need one or you think you need one, that's no problem, all right? If you want to go ahead and talk about this again without an attorney here, that's no problem either.  That's your decision.  We can't tell you. . . .
>
> Defendant: But could I have an attorney here tonight, though, is what I'm saying.
>
> Detective Haney:  If you can get one here and if you want to talk to one, that's not a problem.

-13-

Defendant: I want to go on and all this sh-- [down in writing][7], but I want to know if I can get a lawyer here tonight besides me having to go to this jail and stay there four or five days and then I come back in here three days later with a lawyer.

Detective Haney: Okay. Let me read this to you, okay, so you'll understand it. Says you have a right to a lawyer for advice before we ask you any questions and to have the lawyer with you during questioning. If you cannot afford a lawyer, one will be provided to you at no cost before any questioning. That means that if you don't want to talk to us and you want to get a lawyer before you talk to us, you can do that. Or if you want to talk to us without an attorney in here, you can do that also. . . . Do you understand that?

Defendant: [Mumble] Okay, that's cool man.

Detective Haney: So you understand that?

Defendant: Yeah.

Detective Haney: So you want to talk to us?

Defendant: Yeah. I mean I don't have anything about ya'll, ya'll are straight. I'm just talking about when we go to court.

Detective Haney: Right, I understand . . . So you want to talk to us right now without an attorney here, right?

Defendant: Yeah.

At this point, the waiver form was then signed by the defendant.

In the present case, the defendant asked Haney whether he needed an attorney. Under Stephenson, this was sufficient to trigger the need to clarify the defendant's desire for counsel during questioning, which the officer did.[8] The defendant seemed concerned about having an attorney for trial or to get him out of jail that night and clearly agreed to talk to the officers without an attorney

---

[7]The tape is somewhat garbled here, but this is our best guess at what was said.

[8]Even under the Davis standard, it would appear to be a good practice to stop questioning to clarify the suspect's desire for counsel if an equivocal statement such as this is made. If no *unequivocal* statement is made by the suspect in the clarification stage that a reasonable officer would understand to be invoking the right to counsel, then interrogation can resume.

present. Upon further questioning about his desire for counsel, the defendant failed to make any request for counsel that a reasonable officer would have understood to be invoking his right to counsel during interrogation. In fact, the defendant made unequivocal statements that he was willing to talk to the officers without an attorney present. We agree with the trial court that the defendant understood his right to have an attorney present during questioning and properly waived the same. There was no undue pressure placed on the defendant, and he appeared calm, clear, and cognizant during the waiver process. See, e.g., State v. Callahan, 979 S.W.2d 577, 580 (Tenn. 1998). The evidence does not preponderate against the trial court's findings, and we, therefore, affirm the court's denial of the motion to suppress this statement.

## II. Sufficiency of the Evidence

The defendant argues that the evidence at trial was insufficient to convict him of the essential elements of criminal responsibility for especially aggravated robbery. We disagree. The defendant is initially cloaked with a presumption of innocence, but this presumption is lost once the defendant is convicted by a jury. Thus, on appeal, the defendant has the burden to prove that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). We must affirm the conviction, unless the evidence at trial was so deficient that no rational trier of fact could have found all of the essential elements of the convicting crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994). This applies to convictions based on either direct or circumstantial evidence or a combination of the two. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App.), perm. app. denied (Tenn. 1990). In determining the sufficiency of the evidence, we do not reweigh the evidence or substitute our own inferences for those of the jury. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). In addition, we give the strongest legitimate view of the evidence and all reasonable inferences to the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S. Ct. 1368 (1993). With these principles in mind, we turn to the evidence.

The defendant was convicted of especially aggravated robbery, which is defined in Tennessee Code Annotated § 39-13-403(a) as robbery: (1) accomplished with a deadly weapon; and (2) where the victim suffers serious bodily injury. Robbery is defined in § 39-13-401(a) as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Pursuant to § 39-11-402(b), a person is criminally responsible for an offense committed by another person if "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]"

After a review of the record in the light most favorable to the State, we conclude that the evidence was sufficient to sustain the defendant's conviction for especially aggravated robbery under a theory of criminal responsibility. The evidence showed that the defendant and Robert Merritt were lying in wait for a victim to rob. The victim testified that he noticed the blue Geo Tracker following another ATM patron and going around to the back of the building when he pulled into the bank parking lot. The robbery and shooting took place with a gun that the defendant knew that Robert Merritt was carrying. The defendant also made a statement to police that the pair had discussed

-15-

robbing the victim and that he knew that a robbery was going to take place. He admitted to Detective Nidiffer in the second Murfreesboro interview that he told Merritt not to rob the victim in front of the ATM because there was a camera in the machine. In his videotaped statement, the defendant admitted involvement in the robbery. In addition, the defendant drove the get-away car from the scene. There is no doubt that the victim received a life-threatening injury from the gunshot wound, and it is irrelevant whether the defendant intended the victim to be seriously injured or not. All that is required for criminal responsibility as to the especially aggravated robbery charge is that he intended to assist in the commission of this armed robbery where the victim was seriously injured. The evidence was sufficient for a reasonable trier of fact to find all of the elements beyond a reasonable doubt, and the jury simply did not believe the claims of the defendant at trial that he was an innocent bystander caught up in the event. We, therefore, affirm the judgment of the trial court.

### III. Ineffective Assistance of Counsel

The defendant argues that his trial counsel was ineffective, because his attorney failed to file a brief with the trial court to support his motion for a new trial, even though the court gave him several extensions of time in order to do so. The defendant claims that this inaction on the part of his trial attorney was prejudicial to him, because the court had previously allowed his videotaped statement to be admitted under a "close call." Following arguments by counsel on the motion for a new trial, the court took its denial of the defendant's motion to suppress under advisement and allowed each counsel to submit a brief with supplemental authority on the question of whether the videotaped statement should have been introduced at trial. Trial counsel never submitted a brief. The court denied the motion based on "the arguments of counsel, the evidence at the hearings and at trial, and on the State's brief." The State argues that the defendant has failed to show any prejudice resulted.

When ineffective assistance of counsel is alleged, a convicted defendant must show two elements before a reversal of his conviction is required: (1) that counsel's performance was deficient; and (2) that such deficient performance prejudiced the defendant. Strickland v. Washington, 466 U.S. 686, 687, 104 S. Ct. 2052, 2064 (1984). To prove deficiency of counsel, the defendant must show that counsel made such serious errors that he or she was not functioning as counsel envisioned by the Sixth Amendment. Id. This inquiry focuses on whether counsel's assistance was reasonable under the circumstances and is treated very deferentially by the court. Id. at 688-89. To prove prejudice, the defendant must show that counsel's errors were so serious that he was deprived of a fair trial. Id. at 687. In other words, even if error occurred by counsel, a conviction is not to be set aside if the error had no effect on the outcome of the trial. Id. at 691. The defendant must show that there is a reasonable probability, absent counsel's errors, the fact-finder would have had a reasonable doubt as to guilt. Id. at 695. In Baxter v. Rose, 523 S.W.2d 930 (Tenn. 1975), our supreme court adopted a similar standard even before Strickland was decided. See also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994) (applying the Strickland standard).

Turning to the record in this case, we conclude that the defendant failed to make an adequate showing on either Strickland prong. It was hardly good practice for counsel to fail to file a brief on an issue that the court had taken under advisement and requested briefs on, especially after asking

for extensions of time in order to do so. However, this inaction does not rise to the level of inadequate representation. Trial counsel made a number of oral arguments during the motion to suppress and the motion for a new trial, including trying to distinguish Davis v. United States, the case that the trial court cited in its opinion denying the motion for a new trial. The defendant had his "day in court" to put forth any arguments to keep the videotaped statement away from the jury and was represented by counsel in doing this.

Additionally, there was no prejudice to the defendant from his attorney's failure to file a brief. There is no reasonable probability that the outcome of the trial would have been different, even if defense counsel had filed a brief. In making his decision to deny the motion for a new trial, the trial judge reviewed all of the evidence and considered defense counsel's oral arguments made at the hearing. The defendant has not shown that anything new would have been added to the debate by filing a brief or that the brief would have changed the judge's mind.

We also conclude that the outcome would not have been different in the absence of the videotaped "confession." There was substantial testimony from the police officers, witnesses at the scene, and the victim that would lead a reasonable trier of fact to conclude beyond a reasonable doubt that the defendant indeed committed this crime. His version of the events given in his trial testimony flies in the face of just about all of the other testimony at trial in addition to his own statement to police in Murfreesboro that was not videotaped. The jury reasonably believed that he played an active role in this crime. We, therefore, conclude that the defendant has failed to carry his burden of showing that his conviction should be overturned due to ineffective assistance of trial counsel and affirm the trial court's judgment.

**CONCLUSION**

We find that there was sufficient evidence to convict the defendant of especially aggravated robbery. We also conclude that the trial court did not err in allowing the defendant's videotaped statement to be introduced at trial and that he has not shown the required elements of Strickland to establish that he received ineffective assistance of counsel. Therefore, we affirm the judgment of the trial court.